FILED
2013 Mar-19  PM 06:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| SUSIE KNOTT, et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 7:06-cv-01553-LSC |
| DOLLAR TREE STORES, INC., | |
| Defendant. | |
| CHELSIE RICHARDSON, CYNTHIA ANN COLLINS, BERYL DAUZAT, | |
| Plaintiffs, | CIVIL ACTION NO. 7:08-cv-00693-LSC |
| v. | OPPOSED |
| DOLLAR TREE STORES, INC., | ORAL ARGUMENT REQUESTED |
| Defendant. | |

## DEFENDANT DOLLAR TREE STORES, INC.'S
## BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR ATTORNEYS' FEES AND COSTS AS A SANCTION

Barbara B. Brown, Esq.
Kenneth M. Willner, Esq.
Carson H. Sullivan, Esq.
PAUL HASTINGS LLP
875 15th Street, NW
Washington, D.C. 20005

Terry Price, Esq.
LAW OFFICE OF TERRY PRICE LLC
One Chase Corporate Center
Suite 400
Birmingham, Alabama 35244

ATTORNEYS FOR DEFENDANT
DOLLAR TREE STORES, INC.

# **TABLE OF CONTENTS**

**Page**

I. PLAINTIFFS' FIRST RESPONSES ARE BOILERPLATE ........................1

    A. The Interrogatories And Responses .....................................1

    B. Plaintiffs' Counsel's Efforts To Cover Up Their Conduct .................3

II. PLAINTIFFS' SECOND RESPONSES ARE ALSO BOILERPLATE........6

III. PLAINTIFFS TRIED TO COVER UP THEIR ACTIONS .........................13

    A. Plaintiffs Avoided Handwritten Answers .........................................13

    B. Plaintiffs' Counsel Tried To Hide Their Instructions To Plaintiffs ...............................................................................................13

    C. Plaintiffs' Counsel Tried To Manipulate The Depositions................14

    D. Plaintiffs Withheld Subpoenaed Documents .....................................15

    E. In Depositions, Plaintiffs Evaded Interrogatory Questions ...............15

    F. Plaintiffs Offered False, Coached Testimony ...................................16

IV. LEGAL ARGUMENT ................................................................................19

V. CONCLUSION...........................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abraham v. Cnty. of Greenville,*
   237 F.3d 386 (4th Cir. 2001) ................................................................19

*Barnes v. Dalton,*
   158 F.3d 1212 (11th Cir. 1998) ..........................................................19

*Carlucci v. Piper Aircraft Corp.,*
   775 F.2d 1440 (11th Cir. 1985) ..........................................................19

*Dotson v. Bravo,*
   202 F.R.D. 559 (N.D. Ill. 2001).........................................................20

*Glatter v. Mroz (In re Mroz),*
   65 F.3d 1567 (11th Cir. 1995) ............................................................19

*Hutto v. Finney,*
   437 U.S. 678 (1978).............................................................................19

*In re Family Dollar FLSA Litig.,*
   No. 3:08MD1932-MU,
   2009 WL 2046042 (W.D.N.C. July 10, 2009) .............................19, 20

*Malautea v. Suzuki Motor Co.,*
   987 F.2d 1536 (11th Cir. 1993) ..........................................................19

*NHL v. Metro. Hockey Club, Inc.,* 427 U.S. 639 (1976) .........................20

*Trueman v. New York State Canal Corp.,*
   No. 1:09-CV-049,
   2010 WL 681341 (N.D.N.Y. Feb. 24, 2010).....................................19

**RULES**

Alabama Rules of Professional Conduct
   3.3(a) ....................................................................................................20
   3.4.........................................................................................................20
   8.4.........................................................................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Fed. R. Civ. P.

37.................................................................................................................19

37(a)(4) ......................................................................................................19

37(a)(5)(A) .................................................................................................19

37(b)(2)(C) .................................................................................................19

37(d)(3) ......................................................................................................19

Dollar Tree Stores, Inc. ("Dollar Tree") respectfully requests that the Court enter an order requiring Plaintiffs and/or their counsel to reimburse the expenses and costs that Dollar Tree incurred as a result of Plaintiffs' conduct in response to special interrogatories.  Plaintiffs tried to provide a false basis for the Court to rely on in ruling on Dollar Tree's motion to decertify the collective action.  Their first answers to special interrogatories were identical boilerplate.  When they were given a second chance, they gave only more refined boilerplate.  They suppressed handwritten responses, misled the Court, withheld documents and coached witnesses to give false testimony, all to avoid revealing their conduct to the Court.  It took more than a year of litigation to reveal what they did. Their conduct prejudiced the administration of justice, delayed the case, and wasted the Court's and Dollar Tree's resources.

I.    **PLAINTIFFS' FIRST RESPONSES ARE BOILERPLATE.**

    A.    **The Interrogatories And Responses.**

The Court ordered each Plaintiff to answer interrogatories about the time spent on manual duties.  *See* Order, July 29, 2010, Doc. 393.  The Court approved nine questions Dollar Tree proposed and a tenth that Plaintiffs requested.  *See* Dollar Tree Stores, Inc.'s Revised Brief in Support of its Motion for Sanctions ("Doc. 480") at 8 & Exs. 4-5. [1]  The Court approved questions about numbers of hours, not percentages. Plaintiffs' counsel responded that they understood and would comply with the Order.

---

[1] To avoid unnecessary duplication in the record, Dollar Tree refers herein to Doc. 480 and its exhibits in which supporting material is cited, all of which are incorporated herein.

*See* Doc. 480 at 8 & Ex. 5.  Dollar Tree served the interrogatories, with blanks for handwritten answers.  *See* Doc. 480 at 8 & Ex. 6.

On August 6, 2010, Plaintiffs' counsel sent a letter to all opt-in Plaintiffs, providing a set of "normal" answers and inviting them not to submit handwritten answers to any interrogatory other than number 10.  *See* Doc. 480 at 8 & Ex. 7.  The "normal" responses reflected Plaintiffs' legal theory, and were *anything but* the individualized answers as requested by the Court.  *See* Doc. 480 at 8-11 & Ex. 6.

Plaintiffs returned at least 189 handwritten answers to their counsel, but 157 answered only Interrogatory No. 10, per their counsel's direction.  Several Plaintiffs confirmed in deposition that their counsel instructed them to answer only No. 10.  *See* Doc. 480 at 13-14 & Ex. 15 at 27:23-28:7, 42:3-12, 44:21-45:1; Doc. 480, Ex. 16 at 274:2-6, 278:3-11; Doc. 480, Ex. 17 at 199:10-12, 203:22-204:8.

Plaintiffs served 236 responses on Dollar Tree.  All are *identical*, except for each Plaintiff's name and store number, and the answer to Interrogatory No. 10.  *See* Def.'s Mot. for Sanctions, Sept. 17, 2010 ("Doc. 407"); Ex. D. (Docs. 407-4 – 407-21.)  Instead of the number of hours, the answers give percentages.  *Compare* Pl. B. Allen's Resps. to Special Set of Interrogs. (Sept. 10, 2010), attached to Doc. 407 Ex. D pt. 1, 1-10, *with* Pl. B. Allen's Resps. to Special Set of Interrogs. (Dec. 22, 2010), attached to Doc. 408 Ex. 2 pt. 1, 3-11.  The answers are virtually identical to the "normal" responses sent to the Plaintiffs.  *See* Doc. 480 at 13 & Ex. 14; *also compare* Doc. 407, Ex. D (Doc. 407-04 – 407-21) *with* Doc. 480, Ex. 7.  For those 32 Plaintiffs

who did provide handwritten information for Interrogatories 1-9, *Plaintiffs' counsel ignored it and served the boilerplate answers instead.  Compare, e.g.*, handwritten responses from Reynolds and Zink (*see* Doc. 480, Ex. 12) *with* typed responses from Reynolds and Zink (*see* Doc. 480, Ex. 13).

Plaintiffs' counsel attached declarations signed by each Plaintiff to the boilerplate answers.  All but 32 Plaintiffs submitted the declarations with handwritten answers to Interrogatory No. 10 without providing any input as to their answers to Interrogatory Nos. 1-9.  *See* Doc. 480 at 14-15 & Ex. 20 at 39:15-23; Doc. 480, Ex. 3 at 270:6-20; Doc. 480, Ex. 20 at 59:11-23, Doc. 480; Ex. 15 at 262:8-263:4.

### B.   Plaintiffs' Counsel's Efforts To Cover Up Their Conduct

When confronted with the boilerplate nature of the answers at a September 24, 2010 hearing, Plaintiffs' counsel, Greg Wiggins, told the Court that he received handwritten answers from each Plaintiff and had those retyped.  Hr'g Tr. at 35:4-14, Sept. 24, 2010, Doc. 424; *see also id*. at 32:9-34:8.  Robert Wiggins told a different story, that Plaintiffs' counsel had made telephone calls to the Plaintiffs to get their input.  *Id*. at 61:7-14.  These statements by Messrs. Wiggins stand in stark contrast to the facts.  First, Plaintiffs' counsel's August 6, 2010 letter encouraged the Plaintiffs to answer *only* Interrogatory No. 10.  Second, when 32 Plaintiffs sent in handwritten answers to Nos. 1-9, Plaintiffs' counsel ignored those and served the same boilerplate for them as for the others.  Third, not a single handwritten answer to Nos. 1-9 was re-typed and served.  Fourth, as reflected in the August 6, 2010 letter, the answers were

- 3 -

gathered by mail, without telephone input. Indeed, every Plaintiff's answer to the first interrogatories states that the Plaintiff "did not speak with anyone concerning the interrogatories,"[2] *See* Response to Interrog. No. 9 in Doc. 407 at 16-17.

The Court stated it was troubled that the Plaintiffs gave percentages instead of numbers of hours. Doc. 424 at 55:5-7; *see also id.* at 53:7-14. Although Greg Wiggins told the Court that the reason was that the average number of hours required a calculation based on weekly figures, *id.* at 37:24-39:17, in fact, the percentages were what Plaintiffs' counsel had already put in the "normal responses."

As the Court ultimately stated, Plaintiffs' counsel's explanation, that over 200 Plaintiffs independently came up with identical responses, was not credible. Doc. 424 at 53:14-21. At an April 4, 2011 hearing, Dollar Tree counsel brought up their belief that Plaintiffs' counsel had sent letters instructing the Plaintiffs how to answer the interrogatories and directing them not to answer Nos. 1-9. The Court stated that such an instruction "would violate the rules of this court, the instructions that this court has given, the orders that this court has given," and "would be a direct contradiction of what has been said in open court by the attorney, by every lawyer that's talked about it from [Plaintiffs'] side." *Id.* at 6:7-9; 7:4-6. Plaintiffs' counsel,

---

[2] Plaintiffs confirmed in deposition that they did not speak to anyone, including Plaintiffs' counsel, in preparation of the first responses. *See, e.g.*, Doc. 480, Ex. 63 at 18:10-19:18; Doc. 480, Ex. 3 at 32:12-18; Doc. 480, Ex. 78 at 134:11-136:3; Doc. 480, Ex. 20 at 59:16-23. Several were coached to testify that they spoke with counsel but the interrogatory answer excludes counsel; however, in fact, neither the interrogatory nor the answer says it excludes counsel. *See, e.g.*, Doc. 480, Ex. 17 at 194:22-197:13; Doc. 480, Ex. 16 at 288:11-293:2.

Greg Wiggins, responded to the Court that "in no way" has Plaintiffs' counsel "told them specifically how to answer questions."  Hr'g Tr. at 7:19-23, Apr. 4, 2011, Doc. 458.  Mr. Wiggins' statement turned out to be false, as shown by his August 6, 2010 letter to the Plaintiffs, which he produced later.  *See supra* at 2.

Plaintiffs misled Dollar Tree and the Court about the handwritten answers, and resisted producing them.  On September 24, 2010, Robert Wiggins first conceded that handwritten answers existed, but said they were illegible. Doc. 424 at 83:24-84:3.  On December 23, 2010, Plaintiffs' counsel listed *only nine Plaintiffs* who had sent in handwritten answers.  *See* Doc. 480, Ex. 21.  Dollar Tree suspected this was not accurate, and asked for the remaining answers.  *See* Doc. 480, Exs. 22-24.  Plaintiffs responded that they were not "withholding any documents responsive to the court's order."  *See* Doc. 480, Exs. 25-26.  The Court ordered Plaintiffs to produce the handwritten answers.  Order, Mar. 1, 2011, Doc. 447.  On March 2, 2011, Plaintiffs again said they had "previously provided all the information" relating to handwritten answers, *see* Doc. 480, Ex. 27, but then told the Court on March 8, 2011 that they had produced all handwritten answers to the *October* interrogatories.  *See* Hr'g Tr. at 3:20-4:5, Mar. 8, 2011, Doc. 466.  When pressed, they admitted they had "a few" handwritten answers to the *August* interrogatories which they had not produced.[3] *Id.* at 5:17-6:15.  The Court reiterated its order to produce them all.  *Id.* at 7:5-17.

---

[3] Plaintiffs argued that they were supposed to produce handwritten answers to the October, not the August interrogatories.  Doc. 466 at 7:3-18.  On the contrary, the Court ordered production of all

On March 11, 2011, Plaintiffs sent 24 more handwritten responses.  Greg Wiggins said these were "the only additional handwritten notes" in his "files."  *See* Doc. 480 at 23 & Ex. 28.  On March 21, 2011, Plaintiffs' counsel reiterated, "we have produced ALL documents . . . in our possession."  *See* Doc. 480, Ex. 30.  This was false.  Plaintiffs finally turned over *189* handwritten responses on April 1, 2011.[4]

## II.   PLAINTIFFS' SECOND RESPONSES ARE ALSO BOILERPLATE.

On October 15, 2010, the Court gave a second chance to those Plaintiffs who gave boilerplate answers to the August interrogatories.  The Court ordered them to "provide complete and individual answers to interrogatories" and to "respond fully and honestly" to every question.  Order at 12-13, Oct. 15, 2010, Doc. 423.  The Court cautioned Plaintiffs not to give boilerplate answers again, and Plaintiffs' counsel acknowledged this.  Doc. 424 at 84:15-23.  The Court also said it was troubled by the failure to have each Plaintiff fill in handwritten responses in the interrogatory forms, and made clear that it should be done that way this time.  Doc. 424 at 10:20-25; *see also id.* at 86:10-87:3; *cf., id.* at 55:15-17.  The Court allowed depositions of 20 Plaintiffs, so Dollar Tree could test the veracity of the answers.  *Id.*; Doc. 434 at 2 Dec. 15, 2010 Order (Doc. 434.); *see also* Order, Mar. 1, 2011, Doc. 447.

---

"original, handwritten responses to *August 4, 2010* interrogatories[.]"  Order, Dec. 15, 2010, Doc. 434 (emphasis added).

[4] The full complement of handwritten answers received on April 4th is Doc. 480, Ex. 31.

Instead of asking the Plaintiffs to send handwritten answers, as the Court directed,[5] Plaintiffs' counsel, Greg Wiggins, sent a letter asking the Plaintiffs to send verifications, which would be placed on new boilerplate answers. He told them to "return your signed declaration page in the enclosed envelope *as soon as you receive this packet.*" Doc. 480, Ex. 33 (emphasis added).

Plaintiffs served 197 answers to the second interrogatories. These answers are boilerplate, just like the first ones, without individualized input from the Plaintiffs. As Bernard Zink admitted, he does not know how his counsel came up with answers for him, except he knows the information did not come from him:

> Q. So you don't know where plaintiff's counsel came up with 25 to 30, 30 to 35, or 25 to 30 in the answer to interrogatory number 2 in Exhibit 9 [second answers]; right? [Objection omitted]
> A. I don't know how she came up with that, he or she.
> Q. All you know is that that information did not come from you; right? [Objection omitted]
> A. Yes.

Doc. 480 at 27-28 & Ex. 3 at 253:8-22; *see also id*. at 254:1-259:7. Zink had given handwritten answers to Plaintiffs' counsel, but he testified they did *not* put any of *that* in his responses. *Id*. at 28 & Ex. 3 at 255:9-256:17. Also, where he gave no handwritten answer, Plaintiffs' counsel had no information from him, and he did not know where those answers came from either. *Id*. at 28 & Ex. 3 at 258:8-259:7.

---

[5] *See* Hr'g Tr. at 19:23-20:14, Dec. 15, 2010, Doc. 446. ("I wanted them to hand write in the blanks and I think I made that clear last time. . . .").

Many Plaintiffs' answers bear the hallmarks of mass copying, such as mistakes when inserting a Plaintiff's name and store numbers into a copy of another Plaintiff's answers. One egregious example is the second responses submitted in Wendy McComb's name. They are identical to Robert Rex Miller's answers, word for word, except for Ms. McComb's name. But Plaintiffs' counsel forgot to change the store number, so every one of Ms. McComb's answers is given for Mr. Miller's store, number 2315. *Compare* Pl. W. McComb's Dec. 2010 Resps. to Special Set of Interrogs., provided in Doc. 480, Ex. 2, pt. 9 at 80-88 *with* Pl. R. Miller's Dec. 2010 Resps. to Special Set of Interrogs., provided in Doc. 480, Ex. 2, pt. 10 at 22-30. Ms. McComb *never* worked in Store 2315. Doc. 480, Ex. 16 at 58:18-59:3.[6] In other answers, Plaintiffs' counsel even forgot to change the Plaintiff's name. The answers for *Rollin Gaines* begin with: "Plaintiff, *Bernard Zink*, submits the following responses . . . ." *See* Doc. 480, Ex. 2, pt. 5, at 33 (emphasis added).

In Plaintiffs' second answers, Plaintiffs' counsel merely used several forms of boilerplate with minor differences in the text. Comparison with the handwritten answers and deposition testimony makes clear that the second answers bear no relationship to the Plaintiffs' own experiences. In the text below, Dollar Tree shows that the numerical responses to the most important interrogatory, No. 5 (concurrent duties) and the text answers to Interrogatory No. 4 (one of the interrogatories that

---

[6] Many other Plaintiffs' answers also include responses for stores in which the Plaintiff never worked. Examples are listed in Doc. 480 at 30.

calls for text answers) are rank boilerplate, all unrelated to any input from the Plaintiffs.  Due to page-length constraints, the boilerplate nature of the answers to other interrogatories is shown in Exhibits B - R, and in Doc. 480 at 32-60.

Interrogatory No. 5 asks Plaintiffs how many hours per week they spend doing exempt and manual duties at the same time.  Plaintiffs' second answers all fall into a narrow range of *1-4 hours per week*, parroting Plaintiffs' counsel's position that Plaintiffs spend little to no time on exempt duties.  Doc. 480 at 3-4; 55-56.  The falsity of these answers becomes apparent when they are compared with the same Plaintiffs' handwritten responses, which range up to "*90-100 hours*" and "*always*," as shown for fifteen Plaintiffs in the chart below.  Plaintiffs' counsel ignored these handwritten answers when they prepared the boilerplate answers.

| **Plaintiff** | **Handwritten Response to Interrogatory No. 5**[7] | **Second Typed Response to Interrogatory No. 5**[8] |
|---|---|---|
| S. Michael | 35 hours/week | 1.5-2.0 hours/week |
| R. Donovan | "I always did this when I was at work" | 1.5-2.0 hours/week |
| M. Edwards | 48+ hours/week | 1 hour/week |
| J. Wills | 40+ hours/week | 1-1 1/2 hour/week |
| C. Rzucek | 45-60 hours/week in Store 1639; 45-50 hours/week in Store 488 | 2-3 hours/week in Store 1639; 2-3 hours/week in Store 488 |
| N. Holler | 75-80 hours/week | 1.0-1.5 hours/week |
| A. Smith | 90-100 hours/week | 1.0-1.5 hours/week |
| S. Sellers | "50-fifty" hours/week | 2-3 hours/week |
| P. Walton | 60-75 hours/week | 1.5-2.0 hours/week |

---

[7] Copies of all handwritten responses to Defendant's Special Interrogatories are Doc. 480, Ex. 1.

[8] In this chart, the hours per day portion of the typed answers is omitted to conserve space.  Copies of all typed responses to Defendant's Second Special Interrogatories are Doc. 480, Ex. 2.

| V. Vamosy | "45 hours or more"/week | 2-3 hours/week |
|---|---|---|
| F. Janer | 12 hours/week | 1.0-1.5 hours/week |
| E. Hornes | 10 hours/week in Store 2754; 8 hours/week in Store 3889 | 1.0-1.5 hours/week in Store 2754; 1.5-2.0 hours/week in Store 3889 |
| F. Lopez | 5 to 10 hours/week | 1.5-2.0 hours/week |
| B. Henry | 5 hours/week | 1.0-2.0 hours/week |
| D. Reynolds | 5 hours/week | 2-3 hours/week |

Plaintiffs' depositions confirmed that the boilerplate answers are false. For example, Plaintiff Zink testified that he spent "75 to 80 percent of the time" observing the store to make sure associates were "doing what they were supposed to be doing." Doc. 480 at 55 & Ex. 3 at 167:17-168:9; *see also id*. at 166:1-15. Plaintiff Wojciechowski testified that he spent 70-80 hours (non-holiday season) and 90-95 hours (holiday season) doing concurrent management duties – far more than the 1.5-2 hours per week in his second answers. Doc. 480, Ex. 19 at 19:12-20:1.[9]

The boilerplate nature of the answers is also clear in the answers that contain text, such as Nos. 4, 6, 8, and 9. For example, the responses to Interrogatory No. 4, which asks whether hours of work differ in various time periods, are comprised of boilerplate with only minor variations. No fewer than 165 Plaintiffs' answers to Interrogatory No. 4 include exactly the following as the first paragraph:

> Store Managers had to be present on Truck days. I often had to unload the truck by myself or with the help of the driver of the truck. And on truck day, I spent basically all day unloading the truck and getting the stock out to the floor.

---

[9] Other Plaintiffs also confirmed that they performed management functions while doing manual tasks. *See* testimony cited in Doc. 480 at 56 n. 69.

*See* Doc. 480, Ex. 37.  The other answers used similar text to make the same

arguments, e.g., "On truck day, I had to work both unloading the truck as well as

spend all or most of the day getting the stock onto the shelves. . . ."  *See* Doc. 480,

Ex. 38; *see also* Doc. 480 at 33-34 for other identical or similar text in this answer.

It is not remotely credible that these answers result from individual input.

Indeed, the handwritten answers are very different than this boilerplate.  A table

giving examples of handwritten answers to Interrogatory No. 4 that are drastically

different than the boilerplate is attached as Exhibit A hereto.[10]

Deposition testimony also contradicts the rote second answers.  For example,

contrary to the boilerplate answer, "the payroll for the store was not increased much,

if at all, during the holiday period:"

- Plaintiff Edelen testified that in the holidays, his store's payroll hours increased *by two-thirds*, from about 300 in the non-holiday season to 531 in the holidays.  Doc. 480, Ex. 17 at 38:15-41:6.  In the holidays, he also hired temporary associates.  *Id.* at 122:20-23.

- Plaintiff Swedberg testified that in holiday weeks, she got an increase in payroll hours of up to two hundred hours, and she hired additional associates in the holiday season.  Doc. 480, Ex. 43 at 83:23-85:8.

Other examples abound, such as testimony rejecting the interrogatory statement

that Plaintiffs often unloaded the truck alone or with the truck driver because no

associates could be scheduled to help.  *See* testimony cited Doc. 480 at 36-38.

---

[10] For example, Plaintiff Wills' second answer is a canned description of variations in workload, contrary to his handwritten answer, "No – pretty much the same all year."  Doc. 480, Ex. 2, pt. 16, at 67-68.  And Plaintiff Hastings' second answer makes no mention of her performance of the "DM's job" during "auditing" and "inventory."  Doc. 480, Ex. 2, pt. 6, at 45.

Plaintiffs' counsel asserted that telephone calls with the individual Plaintiffs are the basis for the answers – but the evidence shows that Plaintiffs' counsel ignored any information from the Plaintiffs except for Interrogatory No. 10.  Indeed, Plaintiff Michael testified that on the telephone he gave Plaintiffs' counsel the same information as in his handwritten responses.  Doc. 480, Ex. 20 at 163:3-22. Yet his handwritten answers and his second typed answers are very different.  For example, his handwritten answer to Interrogatory No. 5 is "35" hours per week (Doc. 480, Ex. 1, pt. 2, at 113), while his typed answer is drastically different:  "15-20 mpd [minutes per day] – 1.5-2.0 hours a week."  Doc. 480, Ex. 2, pt. 9, at 113.

If Plaintiffs' counsel actually had called each Plaintiff and based individual answers on those calls, there would be correspondence between Plaintiffs and counsel reflecting drafts based on the calls being sent to Plaintiffs and returned with comments.  This never happened.  Although the Court ordered Plaintiffs to produce counsel's correspondence with Plaintiffs surrounding the creation of the interrogatory answers, *Plaintiffs did not produce any documents showing they sent any draft of the second answers to any Plaintiff for review*.  Instead, Greg Wiggins' October 25, 2010 letter instructed Plaintiffs to send the verifications "as soon as you receive" the interrogatories, i.e., before the superfluous telephone calls.  *See* Doc. 480, Ex. 33.[11]

---

[11] Plaintiffs' counsel concealed the content of these telephone calls, by instructing witnesses not to answer questions about whether the information given in them is the same as the second answers, whether counsel suggested different answers, *see*, *e.g*., Doc. 480, Ex. 34 at 190:4-192:22, and why the second answers are different than the handwritten answers.  *Id*. at 221:7-224:9.

## III.   PLAINTIFFS TRIED TO COVER UP THEIR ACTIONS.

Plaintiffs went to great lengths to conceal the fact that Plaintiffs' second answers are boilerplate that does not reflect the input of each Plaintiff.

### A.   Plaintiffs Avoided Handwritten Answers.

Plaintiffs' counsel flouted the Court's directive that each Plaintiff give individual, handwritten answers by discouraging the Plaintiffs from giving handwritten answers to Interrogatory Nos. 1-9.  When Plaintiff's counsel told the Court that they sought answers to the second interrogatories via telephone, the Court responded that "[T]hat's what I did not want, Greg.  I wanted them to hand write in the blanks . . . ."  *See* Doc. 446 at 20:11-12.  In this way, Plaintiffs suppressed the handwritten answers of most of the Plaintiffs that would contradict the boilerplate.

Plaintiffs also tried to avoid producing even the few handwritten answers that were created.  It was only after repeated Orders compelling production, and in spite of Plaintiffs' counsel's repeated denials that additional documents existed, that Plaintiffs finally produced the additional handwritten answers.[12]

### B.   Plaintiffs' Counsel Tried To Hide Their Instructions To Plaintiffs.

Plaintiffs' counsel also tried to hide their improper instructions to Plaintiffs. They refused to produce the August 6, 2010 letter until ordered to do so by this Court and the Court of Appeals.  They instructed some Plaintiffs in depositions not to reveal

---

[12] Indeed, there is evidence suggesting that Plaintiffs failed to produce to Dollar Tree additional handwritten answers as set forth in more detail in Doc. 480 at 62-63.

the instructions in the letter.  *See, e.g.*, Doc. 480, Ex. 16 at 274:7-277:11; Doc. 480,

Ex. 34 at 188:8-192:1, 192:17-22, 221:7-224:9; Doc. 480, Ex. 15 at 26:9-12.  Several

Plaintiffs offered false testimony denying that their counsel suggested interrogatory

answers or denying they were told to answer only Interrogatory No. 10.  *See, e.g.*,

Doc. 480, Ex. 19 at 17:11-16; Doc. 480, Ex. 17 at 192: 9-17; Doc. 480, Ex. 51 at

123:23-124:13.  Plaintiffs' counsel took no steps to correct this false testimony.[13]

### C.   Plaintiffs' Counsel Tried To Manipulate The Depositions.

Dollar Tree designated 20 individuals for depositions, but Plaintiffs refused to

cooperate.  When Dollar Tree moved to compel, Plaintiffs responded that six would

not appear, and unilaterally declared that "fourteen depositions is more than

adequate."  Pls.' Mot. for Protective Order regarding April 2011 Deps., at 7, Mar. 23,

2011, Doc. 451.  Plaintiffs also insisted on veto-power over the deponents.  *See* Hr'g

Tr. at 16:1-25:11; 30:20-25, Mar. 28, 2011, Doc. 459.  The Court disagreed, *id.* at

26:2-8, 31:4-6, and ordered depositions of the 20 plaintiffs Dollar Tree designated.

(Doc. 447.)  Plaintiffs failed to produce four of them anyway.  One was excused by

the Court, Mar. 28, 2011 Hr'g Tr. at 28, but the others failed to appear, and Dollar

Tree was forced to depose others instead.

---

[13] There is also evidence that Plaintiffs' counsel withheld an additional letter with instructions to the
Plaintiffs, in spite of the Court's order to produce all such letters, which was affirmed by the Court
of Appeals.  (Docs. 463, 470, 474.).  Plaintiffs have admitted that there is such a third letter.  *See*
Doc. 424 at 41:10-14.  In spite of the Court's orders, and even though Plaintiffs did not identify the
letter in their privilege log, Plaintiffs still have not produced it.

**D.     Plaintiffs Withheld Subpoenaed Documents.**

Dollar Tree subpoenaed Plaintiffs' resumes.  Dollar Tree expected them to

reveal statements about Plaintiffs' work that would contradict the canned answers.

During the first deposition, Janinne Juve admitted that she had not brought a resume

that describes her Dollar Tree work.  But she refused to retrieve it.  *See* Doc. 480, Ex.

54 at 23:9-24:18.  Upon Dollar Tree's motion, the Court ordered her to produce it.

Once revealed, the resume contradicted her boilerplate interrogatory answer:

| Juve Second Typed Int. No. 8, Resp. 1 | Juve Resume (Juve Dep. Ex. 7) |
|---|---|
| "Not 'responsible' for Store." | "Responsible for all aspects of variety store operation." |

Another Plaintiff also failed to bring a resume, and was forced to retrieve it

during the deposition.  This resume also contradicted the canned answers.  *Compare*

Holler Second Typed Int. No. 8, Resp. 5 ("Could not hire") with Holler Dep. Ex. 3

(Responsible for the "[h]iring, scheduling, and retention of store staff").[14]

**E.     In Depositions, Plaintiffs Evaded Interrogatory Questions.**

Plaintiffs tried to memorize the answers and repeat them in deposition.  But

sometimes they could not remember the script.  For example, instead of answering a

question, Janinne Juve said that she wanted "to be able to see and refer to a copy of

those answers. . . ."  Doc. 480, Ex. 54 at 184:10-11.  When Dollar Tree's counsel did

not show it to her, Plaintiffs' counsel, Greg Wiggins, instructed her to "adopt" her

---

[14] Plaintiffs Edelen and Michael also failed to bring resumes that they admitted they had.  *See* Doc. 480, Ex. 35 at 37:8-40:2; Doc. 480, Ex. 17 at 17:21-18:11; Doc. 480, Ex. 20 at 13:2-13.  But Plaintiffs' counsel never produced them even though they said that they would do so after the depositions. *See* Doc. 480, Ex. 35 at 40:10-21; Doc. 480, Ex.20 at 13:18-21.

interrogatory answer.  *Id.* at 185:15-23, 196:4-21, 197:18-199:1, 200:21-202:3.

When Mr. Wiggins started to show it to the witness, Dollar Tree's counsel called the

Court.  *Id.* at 199:23-200:20.  The Court ruled that Plaintiffs cannot adopt or review

the answers, Hr'g Tr. at 4:10-11; 4:20-5:5; 5:9-19, Apr. 4, 2011, (Doc. 462).

Plaintiffs' counsel even unilaterally terminated a deposition to avoid

questioning about the interrogatories.  At the deposition of Ron Greer, Dollar Tree's

counsel tried to read each interrogatory to Greer and ask him to answer it.  *Compare*

Doc. 480, Ex. 35 at 179:2-6 *with* Doc. 480, Ex. 6, Interrog. No. 1.  But Plaintiffs'

counsel took the witness and left, without leave of Court, claiming that the deposition

had reached the four-hour mark.  *See* Doc. 480, Ex. 35 at 183:21-199:12.[15]

**F.     Plaintiffs Offered False, Coached Testimony.**

Plaintiffs tried to offer false, coached testimony, parroting the canned

interrogatory answers and covering up their lack of input into the answers.  Perhaps

the most brazen example of false testimony came from Plaintiff Wendy McComb.

As stated *supra* at 8, the answers submitted in her name are a word-for-word copy of

Robert Rex Miller's answers, even including his store numbers (where Ms. McComb

never worked).  Yet, Ms. McComb spun a ridiculous tale that the answers were her

---

[15] Plaintiffs' unilateral termination of the deposition was contrary to the Scheduling Order, which provides that a deposition may exceed four hours if "the witness has so much information to tell," or has been "evasive" or the opposing attorney "delayed the deposition."  Revised Scheduling Order at 3, Mar. 26, 2008, Doc. 121.  Thus, even if the deposition had exceeded four hours, it should have continued until completion.  This is especially true in light of Plaintiffs' counsel's obstruction and delay of the deposition, e.g., through refusing to produce subpoenaed documents, coaching of the witness and other dilatory conduct.  *See, e.g.*, Doc. 480, Ex. 35 at 66:16-69:22, 71:12-72:3.

own words, that she gave her answers to Plaintiffs' counsel over the telephone twice, and then reviewed them on paper, and that everything except the store numbers was correct. *See* Doc. 480 at 69-70 & Ex. 16 at 18:2-21, 20:3-21, 21:5-6. Her story is an obvious falsehood, in light of the fact that McComb's answers are a carbon copy of Miller's, and thus contain none of McComb's input. Also, although the Court ordered Plaintiffs to produce Plaintiffs' counsel's correspondence with Plaintiffs surrounding the creation of the interrogatory answers, *Plaintiffs have not produced a single document showing that they sent any draft of interrogatories to any Plaintiff (including McComb) for review.* Other Plaintiffs similarly made up false tales that the canned answers were actually their own words. *See* Doc. 480, Ex. 17 at 200:21-201:1; *see also id.* at 200:7-201:13, 206:12-207:12, 207:4-8.[16]

Likewise, even though nearly every Plaintiff answered only Interrogatory No. 10, and Mr. Wiggins' August 6, 2010 letter essentially instructs the Plaintiffs not to answer Nos. 1-9, Charles Wojciechowski testified it was his own idea—without input from anyone—to answer only No. 10. Doc. 480, Ex. 19 at 16:23-17:16. He explained, "it would answer the rest of the questions by looking at that answer." *Id.* at 17:4-6. When pressed, he admitted that in fact No. 10 does not answer all the

---

[16] Eventually, Edelen conceded that the words were not actually his, but insisted that they contained "the answers that I gave." *Id.* at 206:17-20.

questions.  *Id.* at 26:14-27:12.  Nor could he explain why 190 others answered only No. 10 if it was his idea and there was no instruction.  *Id.* at 30:12-31:16.[17]

Plaintiffs' counsel did nothing to remedy this false testimony; instead, their coaching facilitated it.[18]  Where Plaintiffs fell off the script in depositions, Plaintiffs' counsel interfered.  For example, when Plaintiff Lelakowski was asked whether it was her testimony that an interrogatory answer was incorrect, Greg Wiggins interjected "No.  That would not be your testimony. . . ."  *See* Doc. 480 at 72-76 & Ex. 63 at 251:3-252:2.  Plaintiffs' counsel also often used speaking objections to suggest answers, and hand signals to cut off testimony deemed undesirable.  Numerous examples of such coaching during depositions, including videolinks by which the testimony can be viewed for each instance, are described in Doc. 480 at 72-76.[19]

---

[17] As is common with false testimony, Plaintiffs contradicted themselves.  For example, Gallagher-Tribbett testified first that she handwrote answers to all 10 interrogatories, but sent only No. 10 to Plaintiffs' counsel.  Doc. 480, Ex. 15 at 27:20-28:7.  Then, she said she sent all 10.  *Id.* at 28:8-15.  Then, after Dollar Tree demanded production of Nos. 1-9, she said she did not remember what she sent, and then she said she sent only No. 10.  *Id.* at 28:16-31:18.  Similarly, Greer testified both that he handwrote all 10 answers and sent them to Plaintiff's counsel, Doc. 480, Ex. 35 at 23:11-24:11, and that he gave a handwritten answer only to Interrogatory No. 10.  *Id.* at 21:13-23.  To cover all bases, he also said that he "answered them all.  But it was all phone conversations."  *Id.* at 23:5-6.

[18] Specifics of off-the-record coaching are unknown, because Plaintiffs' counsel instructed Plaintiffs not to answer questions about whether counsel told them how to answer questions.  *See, e.g.*, Doc. 480, Ex. 54 at 10:1-11:13.  Nevertheless, the results are manifest in the testimony above.

[19] *See e.g.*, Doc. 480, Ex. 84 at 281:9-286:9; Doc. 480, Ex. 78 at 176:1-11; Doc. 480, Ex. 85 at 152:23-153:7; Doc. 480, Ex. 17 at 183:21-184:2, 194:22-197:6, 198:2-9, 201:14-19, 203:5-21; Doc. 480, Ex. 35 at 66:12-68:4, 142:3-15, 143:4-18; Doc. 480, Ex. 20 at 154:12-155:8, 184:17-185:13; Doc. 480, Ex. 54 at 85:11-87:2, 167:6-168:16, 184:13-186:4, 200:12-201:8; Doc. 480,Ex. 63 at 110:22-111:8, 213:17-214:5; Doc. 480, Ex. 51 at 65:12-22, 86:14-87:10, 88:8-91:23, 125:6-15.

## IV.   <u>LEGAL ARGUMENT.</u>

Plaintiffs' conduct in response to the special interrogatories requires a sanction. Rules 37(a)(5)(A), 37(b)(2)(C) and 37(d)(3) of the Federal Rules of Civil Procedure provide that the Court "must" require a party or its attorney to pay the reasonable expenses, including attorney's fees, caused by the failure to comply with a Court order or with interrogatories.  The Court has substantial discretion as to sanctions. *See Malautea v. Suzuki Motor Co.,* 987 F.2d 1536, 1542 (11th Cir. 1993).[20]

Plaintiffs violated their discovery obligations and the Court's Orders, including the telephonic order of August 3, 2010, and Orders of October 15, 2010 (Doc. 423), December 15, 2010 (Doc. 434), and March 1, 2011 (Doc. 447).  In spite of the Orders requiring Plaintiffs to answer interrogatories, Plaintiffs gave only boilerplate answers that were effectively no answers at all.  *See Abraham v. Cnty. of Greenville*, 237 F.3d 386, 392 (4th Cir. 2001); *Trueman v. N.Y. State Canal Corp.*, Civ. No. 1:09-CV-049, 2010 WL 681341, at *3 (N.D.N.Y. Feb. 24, 2010); Fed. R. Civ. P. 37(a)(4).  It is well established that a sanction is appropriate when plaintiffs provide boilerplate answers to interrogatories.  Indeed, another court sanctioned the same Plaintiffs' counsel for serving boilerplate answers in an FLSA case in 2009.  *See In re Family Dollar FLSA Litig.*, No. 3:08MD1932-MU, 2009 WL 2046042, *at 6 (W.D.N.C. July 10, 2009).

---

[20] In addition to Rule 37, the Court has the inherent power to sanction a party or attorney who in bad faith disrupts or delays the litigation or hampers enforcement of a court order.  *Hutto v. Finney*, 437 U.S. 678, 690 n.14 (1978) (citation omitted); *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1447 (11th Cir. 1985); *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998); *Glatter v. Mroz* (*In re Mroz*), 65 F.3d 1567, 1575 (11th Cir. 1995).

Plaintiffs' conduct prejudiced Dollar Tree and the Court.  Although the Court ultimately had a sound record to support its decision decertifying the case, Plaintiffs denied the Court and Dollar Tree the individualized answers to interrogatories that the Court requested.  Plaintiffs' intransigence and cover-up also resulted in repeated motions to compel and Court orders, and inflicted needless litigation costs and over a year of delay on Dollar Tree.[21]  At bottom, Plaintiffs tried to give the Court false information – on which they asked the Court to rely – and then tried to cover it up.[22] Sanctions are necessary to deter such conduct.  *NHL v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-44 (1976); *Dotson v. Bravo*, 202 F.R.D. 559, 573 (N.D. Ill. 2001).

## V.    CONCLUSION.

For the reasons set forth above, Dollar Tree respectfully requests an award of attorneys' fees and costs incurred in litigating motions related to the interrogatories, taking depositions related to the interrogatories; obtaining documents related to the depositions, and preparing motions for sanctions.  Upon request, Dollar Tree will provide a calculation of the fees and costs incurred, and records to substantiate them.

---

[21] Plaintiffs also tainted the witnesses.  As a result of the instructions to Plaintiffs as to how to answer interrogatories, "any future discovery concerning the pertinent factual issue may be useless . . . their testimony concerning the actual percentage of time each Plaintiff spent may be subject to impeachment due to suggestions made in the cover letters."  Order at 6, June 22, 2011, Doc. 470. That is what happened in the depositions, when Plaintiffs tried to parrot back the answers.

[22] Plaintiffs' repeated refusals to comply with the Court's order to provide honest and individualized interrogatory answers, combined with an effort to cover up their conduct, also meet the standard for "bad faith."  *See In re Family Dollar*, 2009 WL 2046042, at *6.  Also, as explained in more detail in Doc. 480 at 80-82, Plaintiffs' counsel's conduct also constitutes misconduct under the Alabama Rules of Professional Conduct 3.3(a), 3.4 and 8.4, and that provides further evidence of bad faith.

Date: March 19, 2013                    Respectfully submitted,

                                          /s/ Kenneth M. Willner
                                        Barbara B. Brown, Esq. (D.C. Bar
                                        No. 355420) (admitted *pro hac vice*)
                                        barbarabrown@paulhastings.com
                                        Kenneth M. Willner, Esq. (D.C. Bar
                                        No. 415906) (admitted *pro hac vice*)
                                        kenwillner@paulhastings.com
                                        Carson H. Sullivan, Esq. (D.C. Bar No.
                                        488139) (admitted *pro hace vice)*
                                        carsonsullivan@paulhastings.com
                                        PAUL HASTINGS LLP
                                        875 15th Street, NW
                                        Washington, DC 20005
                                        Telephone: (202) 551-1700
                                        Telefacsimile: (202) 551-1705

                                        Terry Price, Esq. (ASB-4658-E58T)
                                        terrypricesr1@mac.com
                                        LAW OFFICE OF TERRY PRICE LLC
                                        One Chase Corporate Center
                                        Suite 400
                                        Birmingham, Alabama 35244
                                        Telephone:  (205) 222-4473
                                        Telefacsimile:  (205) 403-8892

                                        ATTORNEYS FOR DEFENDANT
                                        DOLLAR TREE STORES, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Gregory O. Wiggins, Esq.
Robert L. Wiggins, Esq.
Joshua D. Wilson, Esq.
Rocco Calamusa, Jr., Esq.
Kevin W. Jent, Esq.
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203

Bernard D. Nomberg, Esq.
David P. Nomberg, Esq.
THE NOMBERG LAW FIRM
The Harris Building
115 Richard Arrington, Jr. Blvd.
Birmingham, Alabama 35203

P. Mark Petro, Esq.
PETRO LAW FIRM
2323 2nd Avenue North
Birmingham, Alabama 35203

Gerald A. Templeton, Esq.
TEMPLETON GROUP, PC
400 Union Hill Dr., Ste. 210
Birmingham, Alabama 35203

　/s/ Kenneth M. Willner　　　
Kenneth M. Willner

EXHIBIT A

## Examples of Handwritten Answers to Interrogatory No. 4.

| Name | Handwritten Answer To Int. 4 |
|---|---|
| B. Zink | Store 1194:  All of this was about the same and 2 times a year I would have to go to other's store's [sic] to do store inventory. Store 2740:  This was a new store opening and I had to hire all of the people about (40) [sic] and did week's [sic] 3-4 of stocking to open the new store. Store 2740:  Same as 1194. |
| F. Janer | Yes, for Christmas season 15-20 hours more each week for stocking and running register. |
| V. Poliskie | Normal tasks did not vary.  On truck days I spent more time at the store physically unloading truck, scheduling work tasks for employees, Cleaning & Stocking. |
| J. Wills | No – pretty much the same all year. |
| C. Hastings | Arlington Store:  During the end of each year when we did auditing, I would preform [sic] part of my DM's job getting ready for inventory and work my shift then an overnighter to do the count in the stock room and had to stay for half the day till inventory was done. Weatherford Store:  Was made to stay overnight to do the District manager job (this was not known until [sic] I had stayed open to close the day before and even stayed half the day of inventory). DMs name was Bruse. |

EXHIBIT B

**Plaintiffs Second Responses to Interrogatory Nos. 1 and 2**

Plaintiffs ignored handwritten answers and used boilerplate in the second

answers to Interrogatory Nos. 1 and 2 (recovery and stocking).  Again, they

disregarded the handwritten input.  For example:

| **Name** | **Second Typed Answer To No. 1** | **Handwritten Answer To No. 1** |
|---|---|---|
| B. Zink | 1.0-1.5 hpd = 5-8 hpw in Store 1194; 1.5-2.0 hpd = 8-10 hpw in Store 2740; 1.0-1.5 hpd = 5-8 hpw in Store 977 | 25 hours/week in Store 1194; 30 hours/week in Store 2740; 25 hours/week in Store 977 |
| N. Holler | 2.5 to 3.0 hpd = 15-18 hpw | 35 hours/week |
| D. Reynolds | 1.0 to 2.0 hpd = 5-10 hpw | 25 hours/week |
| C. Hastings | 2.0-2 1/4 hpd= 12-14 hpw in Arlington Store; 2.0-2 1/2 hpd = 12-15 hpw in Dallas Store; 2 1/2- 3 hpd = 15-18 hpw in Weatherford Store | 6 hours/week |
| P. Szybka | 2.0 to 3.0 hpd = 10-15 hpw | 1½-3 hours/week |

and:

| **Name** | **Second Typed Answer To No. 2** | **Handwritten Answer To No. 2** |
|---|---|---|
| B. Zink | Truck: 1-2 hours a week Stocking: 5 - 6 hpd = 25-30 hpw in Store 1194; Truck: 2 to 3 hours a week Stocking: 6-7 hpd = 30-35 hpw in Store 2740; Truck: 1 - 2 hours a week  Stocking: 5-6 hpd = 25-30 hpw in Store 977 | 3 hours/week in Store 1194; 3 hours/week in Store 2740; 3 hours/week in Store 977 |
| N. Holler | Truck: 3 - 4 hours twice a week. Stocking: 6-7 hpd = 36-42 hpw | 30 hours/week |
| D. Reynolds | Truck and Stocking: 5.5 to 6.5 hpd = 28-33 hpw | 28-33 hours/week |
| C. | Stock: 5 1/2-6 hpd = 34-36 hpw Truck: | 8-10 hours/week |

| Hastings | 4 hpw in Arlington Store; Stock: 5 1/2-6 hpd = 34-36 hpw Truck: 3-4 hpw in Dallas Store; Stock: 6-6 1/2 hpd = 36-39 hpw Truck: 3-4 hpw in Weatherford Store | |
|---|---|---|
| P. Szybka | Truck: 2 - 4 hours per week. Stocking: 6-7 hpd = 30-35 hpw in Store 179; Truck: 2 - 4 hours per week  Stocking: 7 to 8 hpd = 35-40 hpw in Store 275 | 2 hours/week in Store 179; 2½ hours/week in Store 275 |

Plaintiffs' deposition testimony also was substantially different than their second answers.  Plaintiff Zink admitted that his handwritten response to these interrogatories is different than the second answers, and that the second responses were not his answers.  Doc. 480, Ex. 3 at 42:8-19; 44:5.  Likewise, Plaintiff Gallagher-Tribbett testified that she personally spent only "three to four hours a week" recovering the store – in contrast to her answer of 10-13 hours per week to Interrogatory No. 1.  *Compare* Doc. 480, Ex. 15 at 249:18-20 *with* Doc. 480, Ex. 2, pt. 5, at 44.

EXHIBIT C

**Plaintiffs' Second Responses to Interrogatory No. 3**

Plaintiffs' second answers to Interrogatory No. 3 again disregard their handwritten answers, this time about time spent cashiering.  Usually, the boilerplate greatly exaggerates the time spent cashiering – but a few times it even ignores a handwritten answer that would have been more favorable to Plaintiffs.

**Comparison of Examples of Second Typed Answers and Handwritten Answers to Interrogatory No. 3.**

| Name | Second Typed Answer To No. 3 | Handwritten Answer To No. 3 |
|---|---|---|
| S. Larkin | 1.5-2.0 hpd = 8-10 hpw | 50-60 hours/week in three stores |
| C. Iddings | 1.5 to 2.5 hpd = 8 to 15 hpw | 5 hours/week |
| P. Szybka | 1.0 to 2.0 hpd = 5-10 hpw in Store 179 2.0 to 2.5 hpd = 10-13 hpw in Store 275 | 2 hours/week in Store 179; 2.5 hours/week in Store 275 |
| F. Lopez | 1.5 to 2.0 hpd = 9 to 10 hpw | 5 hours/week |
| C. Hastings | 1-2 hpd = 9-11 hpw | 1 hour/week |
| K. Ford | 3-4 hpd = 15-20 hpw | 25 hours/week |

Plaintiffs' deposition testimony illustrates the exaggeration of the cashiering time.  For instance, although Plaintiff Gallagher-Tribbett's interrogatory answers state she spent 10-13 hours per week running the cash register, Doc. 480, Ex. 2, pt. 5, at 45, No. 3, she testified that in fact she spent only two or three hours per week doing so.  *See* Doc. 480, Ex. 15 at 221:7-10.  Similarly, contrary to Greer's interrogatory answer that he spent 5-10 hours per week running the cash register at

store 3402, Doc. 480, Ex. 2, pt. 5, at 111, No. 3, he testified that he ran the register only 2-3 hours per week there.  *See* Doc. 480, Ex. 35 at 187:15-188:11.

EXHIBIT D

**Plaintiffs' Second Answers To Interrogatory No. 6.**

Nearly every Plaintiff evaded Interrogatory No. 6 by referring to the answer to Interrogatory No. 5.  Plaintiffs tried without success to camouflage this identical answer with insubstantial variations in wording.

- 192 Plaintiffs stated:  "See answer to Interrogatory No. 5 above."[23]

- Four used this variation:  "This interrogatory asks the same questions as No. 5 above; therefore, please see my response to No. 5 above."[24]

Plaintiffs' handwritten answers show that the real answer to Interrogatory No. 6 is different than the answer to No. 5.  Thus, the mere reference to the answer to No. 5 is not an accurate response to No. 6.  For example:

| Name | Handwritten Answer To No. 5 | Handwritten Answer To No. 6 |
| --- | --- | --- |
| C. Rzucek | 45-60 hours/week in store 1639 | 1-6 hours/week in store 1639 |
| N. Holler | 75-80 hours/week | 10-15 hours/week |
| B. Herbert | Include all of the above in a 60 hour work week.  No way of separating | 0 hours/week – Never enough time |
| S. Michael | 25 hours/week in store 2052; 35 hours/week in store 554 | 10-15 hours/week in store 2052; 20-25 hours/week in store 554 |
| R. Donovan | I always did this when I was at work | 5-7 hours/week at 4 stores |
| M. Edwards | 48+ hours/week | 10 hours/week |
| V. Vamosy | 45 hours or more | 5 hours |

---

[23] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 46.

[24] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 47.

EXHIBIT E

**Plaintiffs' Second Answers to Interrogatory No. 7**

Plaintiffs' second responses to Interrogatory No. 7, which asks how much

time was spent opening and closing the store, all use the form "Opening: _____

minutes per day = _____ hours per week.  Closing: ___ minutes per day = ___ hours

per week,"[25] with only minor variations in the numbers filling in the blanks,

usually five hours or less per week.  Once again, Plaintiffs' handwritten answers,

ranging up to 25 hours per week, show that these typed responses do not reflect

their individual input.

**Comparison of Examples of Second Typed Answers and Handwritten
Answers to Interrogatory No. 7.**

| Name | Second Typed Answer To No. 7 | Handwritten Answer To No. 7 |
|---|---|---|
| S. Michael | Store 2052:  No answer;<br>Store 554:  Opening: 20-30 minutes per day = 2-3 hours per week.  Closing: 45-60 minutes per day = 4-6 hours per week.  The Assistant Manager and the Key Holder could also perform Opening and Closing procedures. | 10-12 hours/wk<br><br>12-18 hours/wk |
| M. Edwards | Opening:  15 minutes per day - 1.5 hours per week.  Closing: 30 minutes per day or 3 hours per week.  The Assistant Manager or a "key holder" could also perform Opening and Closing procedures. | 10-15 hours/wk |
| D. Thatch | Opening:  45 minutes per day = 3-4 hours per | 14 hours/wk |

[25] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 76.  For an appearance of variety, some answers to Interrogatory No. 7 include the following boilerplate:  "The Assistant Manager and the Key Holder could also perform Opening and Closing procedures."  Plaintiffs' answers with this text are listed in Doc. 480, Ex. 77.

| | | |
|---|---|---|
| | week.  Closing: 1 hour per day = 5 hours per week.  The Assistant Manager and the Key Holder could also perform Opening and Closing procedures. | |
| A. Smith | Opening:  15 minutes per day = 1.5 hours per week.  Closing: 30 minutes per day = 3.0 hours per week.  The Assistant Manager and the Key Holder could also perform Opening and Closing procedures. | 25 hour/wk |

EXHIBIT F___

**Plaintiffs' Second Answers to Interrogatory No. 8, Part 1.**

In response to Interrogatory No. 8, part one, which asks for the number of

hours spent "[r]esponsible for all store functions, including opening, closing,

ordering, freight processing and all day to day store activities:"

- 167 Plaintiffs said:  "Not 'responsible' for Store.  The DM was.  No time estimate possible."[26]

- 30 answers used this slightly different wording:  "I was not responsible for all store functions.  I cannot give a time for this."[27]

In contrast, the handwritten answers reveal that many Plaintiffs had no

trouble stating the average time they spent responsible for the entire store.

| Name | Second Typed Answer To Int. 8, Resp. 1 | Handwritten Answer To Int. 8, Resp. 1 |
|---|---|---|
| P. Szybka | Not "responsible" for Store. The DM was. No time estimate possible. | 65 hours/week |
| S. Sellers | [same] | 50 hours/week |
| A. Smith | [same] | 10-12 hours/day |
| S. Michael | [same] | 12-18 hours/week |
| B. Zink[28] | [same] | 3 hours/week |
| F. Janer | [same] | 10 hours/week |
| D. Reynolds | [same] | 5 hours/week |
| N. Holler | [same] | 5 hours/week |
| P. Ryan | [same] | 3-5 hours/week |
| B. Henry | [same] | 1 hour/day |

---

[26] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 48.

[27] Plaintiffs' answers with this text are listed in doc. 480, Ex. 49.

[28] Plaintiff Zink admitted that his handwritten answers to all subparts of Interrogatory No. 8 differed from the typed answers, and that he did not know where the typed answers came from. *See* Doc. 480, Ex.3 at 45:13-46:10.

Many Plaintiffs confirmed in deposition that they were in fact responsible for the whole store, contrary to the boilerplate.  *See* Doc. 480 at 40-41 & Ex. 15 at 57:14-17; Doc. 480, Ex. 17 at 71:6-10; Doc. 480, Ex. 3 at 207:13-19; Doc. 480, Ex. 34 at 148:12-19; Ex. 50 at 148:14-23, 151:17-152:2, 152:13-17, 154:4-9, 14-17; Doc. 480, Ex. 19 at 108:14-19, 109:15-17.  Additionally, several Plaintiffs admitted in resumes that they were responsible for the entire store at Dollar Tree. *See* Doc. 480 at 41 & Ex. 51 at 86:14-23; Doc. 480, Exs, 52, 53, and Ex. 54. at 136:16-137:10.

# EXHIBIT G

## Plaintiffs' Second Answers to Interrogatory No. 8, Part 2.

In response to Interrogatory No. 8, part two, which asks for the number of hours spent "protect[ing] and secur[ing] all Company assets, including store cash," Plaintiffs used boilerplate, filling in the blanks with a narrow range of fictional numbers.  For example:

- 169 Plaintiffs stated:  "All employees protect store assets.  This is done for seconds at a time, over the course of the day, for a total of _____."[29]

- 26 answers used the following variation:  "This is done for short period [sic] throughout the day – estimate would be _____."[30]

Plaintiffs filled in the blanks with numbers between 5 and 30 minutes per day.  This differed dramatically from their handwritten responses, examples of which are shown below, ranging from 10-50 hours per week.

### Comparison of Examples of Second Typed Answers and Handwritten Answers to Interrogatory No. 8, Response 2.

| Name | Second Typed Answer To Int. 8, Resp. 2 | Handwritten Answer To Int. 8, Resp. 2 |
|---|---|---|
| S. Sellers | All employees protect the store assets. This is done for seconds at a time, over the course of the day, for a total of 20 minutes a day. | 50 hours/week |
| F. Janer | [same text], for a total of 30 minutes a day. | 25 hours/week |
| J. Wills | [same text], for a total of 5 – 10 minutes a day. | 40+ watching out for theft loss prevention |
| S. Michael | [same text], for a total of 5 – 10 minutes a | 12 hours/week |

---

[29] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 55.

[30] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 56.

| | day. | |
|---|---|---|
| M. Edwards | [same text], for a total of 22 minutes a day. | 10 hours/week |
| P. Szybka | [same text], for a total of 25 minutes a day. | 2 hours/day |

Plaintiffs further contradicted the typed responses in depositions, where many testified that they were responsible for securing Company assets all day, every day.  *See, e.g.*, Doc. 480, Ex. 19 at 110:12-17 ("at all times"); Holler Dep. at 148:20-149:3; Edelen Dep. at 77:22-78:8; Juve Dep. at 122:17-123:5.

EXHIBIT H

**Plaintiffs' Second Answers to Interrogatory No. 8, Part 3.**

When asked in Interrogatory No. 8, part three, to state the number of hours spent "adher[ing] to all policies and procedures":

- 168 Plaintiffs said:  "Can't put a time to adhering to policies."[31]

- 26 answers used the variation:  "I have no way of determining this time."[32]

In contrast, the same Plaintiffs had no difficulty giving answers, ranging from "always" to "1 hour/week" in handwritten responses and depositions, as shown below.  *See* Doc. 480, pp. 42-43.

**Comparison of Examples of Second Typed Answers and Handwritten Answers to Interrogatory No. 8, Response 3.**

| **Name** | **Second Typed Answer To Int. 8, Resp. 3** | **Handwritten Answer To Int. 8, Resp. 3** |
|---|---|---|
| S. Michael | Can't put a time to adhering to policies. | Always |
| M. Edwards | Can't put a time to adhering to policies. | Always - constant |
| F. Janer | Can't put a time to adhering to policies. | 7 hours/week |
| P. Szybka | Can't put a time to adhering to policies. | 2 hours/day |
| B. Zink | Can't put a time to adhering to policies. | 5 hours/week |
| P. Ryan | Can't put a time to adhering to policies. | 5 hours/week |
| A. Smith | Can't put a time to adhering to policies. | Daily – 1-2 hours |
| N. Holler | Can't put a time to adhering to policies. | 1 hour/week |

---

[31] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 57.

[32] Plaintiffs' answers with this text are listed in doc. 480, Ex. 58.

EXHIBIT I

**Plaintiffs' Second Answers to Interrogatory No. 8, Part 4.**

All but two of Plaintiffs' second answers to Interrogatory No. 8, part four, which asks for the number of hours in which the Plaintiff was "responsible for sales forecasting, work scheduling, payroll hours, and productivity," were identical, except for the numbers filled in the blanks.  Again, the numbers differed widely from those in the Plaintiffs' handwritten answers, as shown below.

**Comparison of Examples of Second Typed Answers and Handwritten Answers to Interrogatory No. 8, Response 4.**

| Name | Second Typed Answer To Int. 8, Resp. 4 | Handwritten Answer To Int. 8, Resp. 4 |
|---|---|---|
| F. Janer | Sales Forecasting (5 mpw), Scheduling (30 mpw), Payroll (25 mpw) and Productivity (25 mpw) Total: About 1.5 hours per week. | 15-20 hours/week |
| S. Michael | Sales Forecasting (5 mpw), Scheduling (30 mpw), Payroll (5 mpd) and Productivity (25 mpw) Total: About 1 hour per week. | 6 hours/week |
| A. Smith | Sales Forecasting (5 mpw), Scheduling (30 mpw), Payroll (35 hpw) and Productivity (25 mpw) Total: About 1.5 hours per week. | 2 hours/day |
| M. Edwards | Sales Forecasting (5 mpw), Scheduling (20 mpw), Payroll (20 mpw) and Productivity (15 mpw) Total: About 1 hour per week | 5 hours/week |
| D. Reynolds | Sales Forecasting (5 mpw), Scheduling (45 hpw), Payroll (15 mpw) and Productivity (25mpw) Total: About 1.5 hours per week. | 5 hours/week |

## EXHIBIT J

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 5.**

In response to Interrogatory No. 8, part five, which asked for the number of

hours spent "[r]esponsible  for evaluating, recruiting, hiring, training, motivating

and counseling of TEAM DOLLAR associates," Plaintiffs again provided

boilerplate text answers, with only minor variations:

- 110 Plaintiffs said:  "Could not hire.  All others not done on a weekly basis."[33]

- 25 used this variation:  "Could not hire.  The other duties were not done on a weekly basis." [34]

Plaintiffs' handwritten answers are very different, including for example

"40+ coaching for improvement" and "This was a new store opening and I had to

hire all of the people (about 40)," as set forth below.

**Comparison of Examples of Second Typed Answers and Handwritten
Answers to Interrogatory No. 8, Response 5.**

| Name | Second Typed Answer To Int. 8, Resp. 5 | Handwritten Answer To Int. 8, Resp. 5 |
|---|---|---|
| J. Wills | Could not hire. All others not done on a weekly basis. | 40+ coaching for improvement" and "40+ mentoring |
| B. Zink | Could not hire. All others not done on a weekly basis. | 5 hours/week at Stores 2740 and 977; 2 hours/week at Store 1194; *See also* Resp. 4: "This was a new store |

---

[33] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 59.

[34] Plaintiffs' answers with this text are listed in Ex. Doc. 480, Ex. 60.  Twenty-eight answers included the following variation:  "Did not do these on a weekly basis," and 12 answers used this variation:  "These were not done on a weekly basis."  Plaintiffs' answers with this text are listed in Doc. 480, Exs. 61 and 62, respectively.

| | | opening and I had to hire all of the people (about 40). . ." |
|---|---|---|
| F. Janer | Could not hire. All others not done on a weekly basis. | 12 hours/week |
| A. Smith | Could not hire. All others not done on a weekly basis. | 1-2 hours/daily |
| D. Reynolds | Did not do these on a weekly basis. | 5 hours/week |
| M. Edwards | Could not hire. All others not done on a weekly basis. | 5 hours/week |
| P. Ryan | Could not hire. All others not done on a weekly basis. | 1 to 4 hours/week |
| N. Holler | Could not hire. All others not done on a weekly basis. | 2 hours/week |
| B. Henry | Could not hire. All others not done on a weekly basis. | 2 hours/week |
| K. Ford | Could not hire. All others not done on a weekly basis. | Recruit and hire Sales associates 1 to 2 hours a week |
| P. Szybka | Could not hire. All others not done on a weekly basis. | 1 hour/day |
| S. Sellers | Did not do these on a weekly basis. | 1 hour/day |

Plaintiffs' deposition testimony confirmed that the boilerplate was false.

Many testified that in fact they can and do hire.  *See, e.g.,* Doc. 480 at 48 & Ex. 45

at 79:3-7, 90:17-18; Doc. 480. Ex. 3 at 98:14-99:4, 242:11-15, 263:9-12, 23; Doc.

480, Ex. 63 at 76:5-20; Doc. 480, Ex. 64 at 191:8-10,  346:21-347:4, 348:6-15;

Doc. 480, Ex. 44 at 28:23-25; Doc. 480, Ex. 16 at 219:22-221:12; Doc. 480, Ex. 19

at 151:21-152:1, 153:19-23.  Moreover, many Plaintiffs testified that they did on a

weekly basis the tasks which the boilerplate states are "not done on weekly basis,"

such as training  *See, e.g.*, Doc. 480 at Ex. 19 at 170:14-19, 171:4-7, 172:1-5; Doc. 480, Ex. 3 at 264:16-23; Doc. 480, Ex. 17 at 87:6-22, 121:2-122:5.

EXHIBIT K

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 6.**

Plaintiffs' answers to Interrogatory No. 8, part six, again were canned.  That

interrogatory asked for the number of hours when the Plaintiff was "[r]esponsible

for maintaining a professional and friendly environment. . . ."  Most Plaintiffs

responded with the following text, with a narrow range of times in the blanks:

- 164 Plaintiffs said:  "Maintaining a professional and friendly atmosphere takes a few seconds at a time throughout the day. For a total of about _____ minutes per day. _____  hours per week."[35]

- 24 were in the form:  "Unsure how to answer this question, but would estimate with assisting customers and greeting customers when the cashier was on break, this would take _____."[36]

The times which Plaintiffs' counsel inserted in the blanks (mostly between 1

and 1.5 hours per week) are very different from those in their handwritten answers,

which range up to "always – constant" as shown in the chart below.

**Comparison of Examples of Second Typed Answers and Handwritten Answers to Interrogatory No. 8, Response 6.**

| Name | Second Typed Answer To Int. 8, Resp. 6 | Handwritten Ans. To Int. 8, Resp. 6 |
|---|---|---|
| S. Michael | Maintaining a professional and friendly atmosphere takes a few seconds at a time throughout the day. For a total of about 10 – 15 minutes per day. 1.0 to 1.5 hours per week. | Always |
| M. Edwards | [same first sentence]  For a total of about 25 minutes a day. 3 hour per week. | Always – Constant |

---

[35] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 65.

[36] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 66.

| P. Szybka | [same first sentence]  For a total of about 10 – 15 minutes per day. 1.0 to 1.5 hours per week. | 8 hours/day |
| J. Wills | [same first sentence]  For a total of about 5 – 10 minutes a day. ½ to 1 hour per week. | 40+ Store environment |
| F. Janer | [same first sentence]  For a total of about 10 – 15 minutes per day. 1.0 to 1.5 hours per week. | 10 hours/week |
| D. Thatch | [same first sentence]  For a total of about 10 - 15 minutes per day. 1.0 to 1.5 hours per week. | Customer Service 10 |
| B. Henry | [same first sentence]  For a total of about 10 - 15 minutes per day. 1.0 to 1.5 hours per week. | 4 hours/week |

Plaintiffs' deposition testimony again confirms that the typed answers are inaccurate.  Many testified that they were responsible all day long for the tasks in this interrogatory.  *See* Doc. 480, Ex. 3 at 103:8-13, 210:16-211:1; Doc. 480, Ex. 34 at 152:4-20 "); Doc. 480, Ex. 54 at 124:10-22.

EXHIBIT L

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 7.**

When asked in Interrogatory No. 8, part seven, to state the number of hours

spent "ensuring that all Team Dollar associates have completed required training

guidelines while maintaining a favorable training environment," Plaintiffs gave

essentially the same response:  151 Plaintiffs said:  "Training not done on a weekly

basis,"[37] and 22 answers included:  "We did not train employees weekly."[38]

These answers are inconsistent with the handwritten answers, which

specified the number of hours per week, ranging up to ten hours, as set below.

Moreover, as set forth in Exhibit J, numerous Plaintiffs confirmed in deposition

that in fact they did train associates on a weekly basis.

**Comparison of Examples of Second Typed Answers and Handwritten
Answers to Interrogatory No. 8, Response 7.**

| **Name** | **Second Typed Answer To Int. 8, Resp. 7** | **Handwritten Answer To Int. 8, Resp. 7** |
|---|---|---|
| B. Zink | Training not done on a weekly basis. | 10 hours/week at Stores 1194 and 977; 2 hours/week at Store 2740 |
| F. Janer | Training not done on a weekly basis. | 6 hours/week |
| D. Reynolds | Training not done on a weekly basis. | 5 hours/week |
| P. Szybka | Training not done on a weekly basis. | 1 hour/day |
| A. Smith | Training not done on a weekly basis. | 4 to 5 hours/week |
| N. Holler | Training not done on a weekly basis. | 1 hour/day |
| S. Michael | Training not done on a weekly basis. | 3 hours/week |

---

[37] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 67.

[38] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 68.

EXHIBIT M

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 8.**

Plaintiffs' answers to Interrogatory No. 8, part eight, are all the same, with slight variations in language.  That interrogatory asks for the number of hours spent "maintain[ing] standards of merchandizing presentation and store signage to maximize sales."  Plaintiffs dodge the question by treating it as if it refers to stocking, and then referring to their answers to Interrogatory Nos. 1 and 2.

- 149 Plaintiffs answered:  "As answered in Interrogatories Numbers 1 and 2, I did an awful lot of stocking in the Store which would include merchandising and store signage. The amount of time spent was included in those answers."[39]

- 23 used this minor variation in wording:  "Essentially, I 'merchandised' and attended to store signage all day every day, with all the stocking and re-stocking I did. I spent my days moving stock and placing it where it was dictated to be placed by the Corporate office.  Please see responses to my previous Interrogatory Answers ## 1 and 2 for time estimates."[40]

Plaintiffs' handwritten answers paint a different picture, as shown below.

Each Plaintiff listed below provided the typed answer in the first bullet above; in contrast with that canned response, the Plaintiffs' handwritten answers to Interrogatory Nos. 8 (part 8), and to Nos. 1 and 2 are not the same.

**<u>Comparison of Examples of Handwritten Answers to Interrogatory No. 8, Response 8 and Handwritten Answers to Interrogatory Nos. 1 and 2.</u>**

---

[39] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 69.

[40] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 70.

| **Name** | **Handwritten Answer To Int. 8, Resp. 8** | **Handwritten Answer To Int. 1** | **Handwritten Answer To Int. 2** |
|---|---|---|---|
| B. Henry | 30 minutes/week | 50 hours/week in St. Helens Store and 30 hours per week in two other Stores | 10 hours/week in all 3 stores |
| S. Sellers | 1 hour/week | 50 hours/week | 50 hours/week |
| N. Holler | 1 hour/week | 35 hours/week | 30 hours/week |
| B. Zink | 2 hours/week Stores 1194 and 977; 3 hours/wk Store 2740 | 8 hours/week | 25-30 hours/week |
| D. Reynolds | 2 hours/week | 25 hours/week | 20 hours/week |
| M. Edwards | 10 hours/week | 18.5 hours/wk. | 36+hours/week |
| S. Michael | Always | 20 hours/week | 35 hours/week |
| J. Wills | 40+ Planograms | 40+ hours/week | 10-20 hours/week |
| A. Smith | continuous as I stocked and cleaned | 18 hours/week | 70-80 hours/week |

EXHIBIT N

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 9.**

In response to Interrogatory No. 8, part nine, which asks for the number of hours spent, "[p]roviding leadership and direction to associates as appropriate to include utilization of daily planner and index cards," Plaintiffs again provided boilerplate text with numbers filled in the blanks of about an hour per week.

- 149 Plaintiffs said: "I spent a few minutes a day leading and directing the staff member scheduled, by giving them an index card with their work assignments. _____ minutes per day. _____ hour a week."[41]

- 22 said: "I provided each of the few employees I had with an index card each day that had their assignments on it. These cards took me about _____ minutes each day to write. Therefore, I estimate direction and leading employees took about _____ hpw." [42]

These responses differ dramatically from their handwritten answers, which range up to "always" and 40+ hours/week," as shown below.

**Comparison of Examples of Second Typed Answers and Handwritten Answers to Interrogatory No. 8, Response 9.**

| Name | Second Typed Answer To Int. 8, Resp. 9 | Handwritten Answer To Int. 8, Resp. 9 |
|------|------|------|
| S. Michael | I spent a few minutes a day leading and directing the staff member scheduled, by giving them an index card with their work assignments. 5 – 10 minutes per day. ½ to 1 hour a week. | Always |
| J. Wills | [same first sentence] 10 minutes per day or an hour a week. | 40+ hours/week delegating projects |

---

[41] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 71.

[42] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 72.

| M. Edwards | [same first sentence]  5 minutes per day or an hour to 30 minutes a week. | 20 hours/week |
| B. Zink | [same first sentence]  About 1 hour a week. | 10 hours/week in Store 1194; 2 hours/week in Stores 2740 and 977 |
| D. Reynolds | [same first sentence]  5 – 10 minutes per day. ½ to 1 hour a week. | 5 hours/week |

EXHIBIT O

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 10.**

In response to Interrogatory No. 8, part ten, which asks for the number of hours spent "processing of all required reports, documents and memos," most Plaintiffs dodged the question the same way:

- 99 Plaintiffs said:  "Processing reports, etc. Can't recall any reports."[43]

In contrast, many Plaintiffs had no difficulty in deposition recalling these reports.  *See, e.g.*, Doc. 480 at 51 & Ex. 15 at 149:3-20, 180:16-18, 223:13-15; Doc. 480, Ex. 19 at 102:7 - 103:18; Doc. 480, Ex. 64 at 198:8-200:19; 231:15-232:7; 237:20-239:9; Doc. 480, Ex. 3 at 106:1-22; 107:10-16; 115:3-15.[44]  And they stated in handwritten answers the time spent using these reports, up to 10 hours a week, as shown below.

**Comparison of Examples of Second Typed Answers and Handwritten Answers to Interrogatory No. 8, Response 10.**

| Name | Second Typed Answer To Int. 8, Resp. 10 | Handwritten Answer To Int. 8, Resp. 10 |
|---|---|---|
| B. Henry | Processing reports, etc. Can't recall any reports. | 5-10 hours/week |
| A. Smith | Processing reports, etc. Can't recall any reports. | 1 hour/day |
| N. Holler | Processing reports, etc. 1 day a week.  3-5 minutes | 2 hours/week |
| B. Zink | Processing reports, etc. Don't recall any reports | 2 hours/week |
| D. Reynolds | Processing reports, etc. Can't recall any reports. | 2 hours/week |

---

[43] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 73.

[44] *See also* Doc. 480, Ex. 16 at 216:23-217:7; Doc. 480, Ex. 50 at 58:3-22; Doc. 480, Ex. 17 at 167:13-170:9 ]; Doc. 480, Ex. 54 at 131:7-10, 143:12-21.

| P. Szybka | Processing reports, etc. Can't recall any reports. | 20 minutes/day |
| S. Sellers | Processing reports, etc. Can't recall any reports. | 1 hour/week |
| P. Ryan | Processing reports, etc. Can't recall any reports. | 30 minutes/week |

EXHIBIT P

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 11.**

Plaintiffs' form answers to Interrogatory No. 8, part eleven, which asks how much time is spent implementing Store Support Center directives, likewise differ widely from their handwritten answers.

**<u>Comparison of Examples of Second Typed Answers and Handwritten
Answers to Interrogatory No. 8, Response 11.</u>**

| <u>Name</u> | <u>Second Typed Answer To Int. 8, Resp. 11</u> | <u>Handwritten Answer To Int. 8, Resp. 11</u> |
|---|---|---|
| J. Wills | Store Directives: 5-15 minutes a day or 1-1 ½ hours a week. | 40+ Customer Service/Conflict Management |
| F. Lopez | Store Directives: 3-4 days a week. Emails and voicemails and phone calls. 5 to 10 minutes a day. 15 minutes to an hour per week. | Manager meeting 15 minutes a day |
| M. Edwards | Store Directives: DM contact - 3-4 days a week. 3-10 minutes a day. 15 minutes to 1 hour a week. | 2 hours/week |
| E. Burch | Store Directives: The DM was in contact with the store on a daily basis either by emails, voicemails or direct phone calls and often a combination of all three. 1-2 hours per week. | 0 hours/week |

EXHIBIT Q

**Plaintiffs' Second Responses to Interrogatory No. 8, Part 12.**

Plaintiffs' canned response to Interrogatory No. 8, part twelve, ducks the

question for all Plaintiffs.  That interrogatory asks for the number of hours spent in

the "proficient use of available tools and technology at the store level."

- 168 Plaintiffs said:  "Can't provide an assigned amount of time."[45]

- 11 answers responded:  "I have no idea what this responsibility means
  and cannot provide a time estimate."[46]

In contrast, in their handwritten answers, many Plaintiffs gave responses,

again ranging up to "Always-Constant," as shown below.

**Comparison of Examples of Second Typed Answers and Handwritten
Answers to Interrogatory No. 8, Response 12.**

| Name | Second Typed Answer To Int. 8, Resp. 12 | Handwritten Answer To Int. 8, Resp. 12 |
|---|---|---|
| M. Edwards | Can't provide an assigned amount of time. | Always - Constant |
| A. Smith | [same] | 10 hours/day as I worked they worked with me to learn |
| B. Zink | [same] | 4 hours/week |
| P. Szybka | [same] | 10 minutes/day in store 179; 15 minutes/day in Store 275 |
| N. Holler | [same] | 1 hour/week |
| P. Ryan | [same] | 30 minutes/week |

---

[45] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 74.

[46] Plaintiffs' answers with this text are listed in Doc. 480, Ex. 75.

EXHIBIT R

**Plaintiffs' Second Responses to Interrogatory No. 9.**

Plaintiffs' answers to Interrogatory No. 9 were also substantively identical. The interrogatory asks Plaintiffs to identify each person with whom the Plaintiff communicated, and each document reviewed in connection with the interrogatories.  Every Plaintiff stated that he or she did not review any documents but did speak with Plaintiffs' counsel.  The answer that no documents were reviewed is known to be untrue.  Plaintiffs received cover letters with the interrogatories, which they were later forced to produce.